# IN THE COURT OF APPEALS OF IOWA

No. 13-1563
Filed June 25, 2014

IN RE THE MARRIAGE OF BRIDGET N. MUSFELDT
AND JACOB L. MUSFELDT,

**Upon the Petition of**
**BRIDGET N. MUSFELDT,**
        Petitioner-Appellee,

**And Concerning**
**JACOB L. MUSFELDT,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Harrison County, Kathleen A.

Kilnoski, Judge.


        A father appeals the dissolution decree's denial of joint physical care.

**AFFIRMED.**


        Joseph J. Hrvol of Joseph J. Hrvol, P.C., Council Bluffs, for appellant.

        Suellen Overton of Overton Law Office, Council Bluffs, for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

Jacob and Bridget Musfeldt have two young daughters. In the decree dissolving the Musfeldt marriage, the district court determined the parents' "communication problems do not bode well for shared care." The court placed physical care of the girls with Bridget and granted extraordinary visitation to Jacob. On appeal, Jacob seeks joint physical care, asserting Bridget's request for physical care "ignores the children's essential need for a caring and involved father after divorce."

We affirm the physical care determination—focusing on three factors as most persuasive. First, we share the district court's concern that the parties struggle to communicate about the children's daily needs. Second, the record shows the frequent transitions between parents' homes under the temporary joint-physical-care order have proven difficult for the older girl. Third, we believe the extraordinary visitation granted to Jacob will provide continuing physical and emotional contact with both parents consistent with the children's best interest.

**I.      Background Facts and Proceedings**

Bridget was twenty-five years old and Jacob was twenty-two when they married in September 2008. They made their home in Missouri Valley. Their first daughter, L.M., was born in January 2010, and their second daughter, G.M., was born in August 2012. The couple separated when G.M. was just three months old. Bridget took the girls and moved in with her parents, who lived close by, and Jacob stayed in the family home.

Bridget received a bachelor's degree from the University of Nebraska Omaha and has taught third grade in Underwood for ten years. Most of her extended family lives in Missouri Valley. Jacob earned a criminal justice degree at Iowa Western Community College and has been a police officer for nine years. Jacob also does other work in the community, including acting as a referee and umpire for local sporting events and doing handy-man jobs such as mowing, window washing, and roofing. He also volunteers his time, including helping his parents on their farm. Both parents enjoy excellent health.

Bridget filed a petition to dissolve the marriage on November 27, 2012. The district court issued a temporary order granting the parties joint physical care of their daughters with a right of first refusal on child care. The court held a dissolution trial on June 14, 2013. Bridget sought physical care of the girls, while Jacob sought joint physical care. In a decree issued July 31, 2013, the court granted Bridget physical care, and provided visitation for Jacob, at a minimum, of every Monday morning through Wednesday evening and alternating Sundays— with overnight Sunday visits during Bridget's summer vacation time. The court gave Jacob an extraordinary visitation credit on his child support obligation. On September 4, 2013, the court issued a few additional findings and conclusions under Iowa Rule of Civil Procedure 1.904(2). Jacob appeals the physical care and child support determinations.

## II.    Standard of Review

We review de novo claims arising from a decree dissolving a marriage. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). "We give weight to

the findings of the district court, especially to the extent credibility determinations are involved." *Id.*; *see also In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007) (recognizing the district court's opportunity to observe the witnesses).

## III. Analysis

Jacob seeks joint physical care of L.M. and G.M. He points out the parties "enjoyed joint physical care of their two daughters by virtue of a temporary order" for five months before the final decree issued. He contends in granting physical care to Bridget, the district court did not consider the parties' successful cooperation under the temporary, joint-physical-care order.

To determine if joint physical care is in the best interest of the children, we look at the factors listed in Iowa Code section 598.41(3) (2011),[1] as well as those discussed in *In re Marriage of Winter,* 223 N.W.2d 165, 166-67 (Iowa 1974).[2] *See Hansen*, 733 N.W.2d at 696. Custody decisions should assure children of divorce the "maximum continuing physical and emotional contact with both parents" insofar as is reasonable and in the children's best interest. Iowa Code § 598.41(1)(a).

---

[1] The statutory factors include the suitability of each parent as a custodian, the parents' ability to communicate regarding the children's needs, the continuity of caregiving both before and after the parents' separation, each parents' ability to support the other's relationship with the children, the parents' geographic proximity, the safety of the children, and any history of domestic abuse. Iowa Code § 598.41(3).

[2] The *Winter* factors relevant to this case include the characteristics of each child, including age, maturity, mental and physical health; their emotional, social, moral, material, and educational needs; the characteristics of each parent, including age, character, stability, mental and physical health; their capacity to provide for the emotional, social, moral, material, and educational needs of the child; the interpersonal relationship between the children and each parent; the relationship between siblings; the effect on the children of continuing or disrupting an existing custodial status; and the nature of each proposed environment, including its stability and wholesomeness. 223 N.W.2d at 166-67.

"Joint physical care" means both parents have "rights and responsibilities toward the child including but not limited to shared parenting time with the child, maintaining homes for the child, providing routine care for the child and under which neither parent has physical care rights superior to those of the other parent." Iowa Code § 598.1(4). Joint physical care is neither disfavored nor preferred over placing physical care with one parent. *Hansen*, 733 N.W.2d at 692. Physical care determinations should not focus on perceived fairness to the spouses, but rather strive to place the child in the environment most likely to promote the child's long-term physical and emotional health. *Id.* at 695. When deciding if joint physical care is appropriate, we focus on the following considerations: (1) the stability and continuity of care giving, (2) the ability of the parties to communicate and show mutual respect, (3) the degree of conflict between the parties, and (4) the degree of agreement about their approach to daily child-rearing matters. *Id.* at 697–99.

The district court did an excellent job of weighing and analyzing the points for and against joint physical care. The court recognized, on the pro side of the scale, the parents live close to one another and to extended family, and they share expectations as far as daycare, local schools, religious upbringing, and other activities available to the girls as they grow older.

But the court also was realistic about the concerns that militate against shared care. Primary among those was the parents' poor communication both during the marriage and the separation. For her part, Bridget controlled and restricted Jacob's contact with the children. For his part, Jacob believed his time

with the girls was his and Bridget's time was hers, and also believed such a limited exchange of information was not detrimental. At trial, he acknowledged he refused to reply to what he believed were "emotional" text messages from Bridget about the girls.

One time during the separation, Bridget sent Jacob a text asking if she could pick up a wagon her parents had given L.M. as a birthday gift so they could use it on a trip to the zoo. He did not respond. Bridget's parents went to Jacob's house and took the wagon, which was sitting on his back patio. Later, Missouri Valley police officers came to the grandparents' home and, after consulting with Jacob, charged them with theft and trespassing. Jacob's actions reflected little mutual respect, and instead fostered a high degree of conflict.

We agree with the district court that the parents' strained communication is an impediment to joint physical care.

We also believe stability and continuity-of-care factors favor placing physical care with Bridget. The parties agreed Bridget filled the role of primary caretaker since the children's births. Jacob was an extremely hard worker and solid provider for the family. But his police work, combined with his second and third jobs, pulled him away from home for long hours. It is true Jacob stepped up his participation in the children's care after the separation. But the joint-physical-care arrangement under the temporary order destabilized their older daughter. Bridget testified L.M. is "confused" and "upset" by the frequent transitions. "The minute she wakes up in the morning she has to know her schedule, what am I doing today, mommy, who's picking me up today. . . . She's consumed by it."

Bridget's mother confirmed the exchanges were "very hard" on L.M. The three-year-old showed aggressive behavior at day care and at her mother's house, and it took her "awhile to readjust to things" after she spent time at Jacob's house. To help L.M. adjust, Bridget set up play therapy for the girl. Bridget initially did so without consulting Jacob, believing he would be against the idea. Even after Bridget let Jacob know about the sessions, Jacob declined to participate, saying it was "Bridget's deal."

We respect Jacob's desire to be a more involved in his daughters' lives. And in declining to order joint physical care, "we have not ignored chapter 598's supposition it is generally in children's best interests to have the opportunity for maximum continuous physical and emotional contact with both of their parents." *See In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000). We note the district court's order for liberal visitation provides the girls with meaningful, sustained time in their father's care.

After a thorough review of the record, we believe continuing the temporary joint-physical-care arrangement would not serve the best interests of L.M. and G.M. Because we have not modified custody, we need not address Jacob's child support obligation.

Finally, Bridget argues Jacob should pay her appellate attorney fees and the costs of the appeal. She claims despite their virtually identical salaries, Jacob has "a considerable source of funds" from extra income and the property division to pay attorney fees.

Appellate attorney fees are not a matter of right, but rest within our sound discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* Because Bridget was forced to defend in this appeal, and Jacob has slightly more income from additional sources, we award Bridget $2000 of her appellate attorney fees.

Costs of the appeal are assessed to Jacob.

**AFFIRMED.**